**Gloria FRANKLIN and Johnny Curry,**
**Plaintiffs–Appellants,**

v.

**Derrick FOXWORTH, et al.,**
**Defendants–Appellees.**

No. 92–35214.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1993.

Decided Aug. 2, 1994.

**874**

Spencer M. Neal, Ginsburg & Neal, Portland, OR, for plaintiffs-appellants.

Harry Auerbach, Deputy City Atty., Portland, OR, for defendants-appellees.

Before: REINHARDT, BRUNETTI and FERNANDEZ, Circuit Judges.

Opinion by Judge REINHARDT; Concurrence by Judge REINHARDT; Concurrence by Judge BRUNETTI.

REINHARDT, Circuit Judge:

Johnny Curry and Gloria Franklin filed an action under 42 U.S.C. § 1983 against three police officers and the City of Portland, alleging that the manner in which the officers executed a search warrant violated their constitutional rights. They did not contest the validity of the warrant itself. Prior to trial, Franklin reached a monetary settlement with the City regarding her claim, and she was subsequently appointed Curry's guardian *ad litem* for the purpose of pursuing his. Following a bench trial on Curry's claim, the district court found that the officers' conduct in executing the warrant was reasonable under the Fourth Amendment, and entered judgment in favor of the defendants. Curry appeals. We reverse, holding that the officers' conduct was unreasonable, and remand for further proceedings consistent with this opinion.

I.

Gloria Franklin and Johnny Curry reside in a house in Portland, Oregon. Curry has advanced multiple sclerosis ("M.S."), a degenerative, terminal illness that results in progressive loss of motor function. He has suffered from that illness for a considerable period of time, and has been completely unable to walk for several years. Curry is unable to feed himself, to sit up without assistance, or to control his bowels. Because of the last problem, he wears only a T-shirt in bed. For more than 10 years he has shared a residence with Franklin, who takes care of him.

One evening, at 10:20 p.m., 23 members of the Portland Police Bureau, under the direction of defendant Derrick Foxworth, executed a search warrant on Curry and Franklin's home. The police had received information that drug activity had taken place at the house and that Franklin's son Michael Fesser was a member of a gang and might be

present. The police officers did not knock and announce before entering the residence. Instead, they broke various windows as a diversionary tactic and then knocked down the front door with a battering ram. The officers announced their presence at the same time that they battered down the door.

Only three persons were present in the home when the 23 officers entered: Gloria Franklin, Johnny Curry and LaTasha Abraham, Fesser's girlfriend. At the time of the raid, Abraham was seven months pregnant.

It is the custom and practice of the Portland Police Bureau when executing search warrants for drugs to pat-search and handcuff all occupants of the residence, and then to detain them at one central location—in this case, the living room of the Curry–Franklin home. It is the further custom and practice of the Portland Police Bureau not to release the detainees until the entire residence has been searched.

Abraham was seized by police officers as she came down the stairs; her hands were cuffed behind her back and she was put in the living room.

Franklin was seized in her bedroom, pat-searched, hand-cuffed, and also led to the living room. As she was being handcuffed, Franklin told the police that Curry was ill and should not be moved from his bed.

Curry was seized in his bedroom by Officers Justus and Billesbach. The officers entered the room with their guns drawn and found Curry lying in bed. He was wearing only a T-shirt at the time. As the district court found, it was "obvious to the police officers at the time of the raid that Mr. Curry was suffering from some sort of disability."[1] The officers searched Curry for weapons and found none. They then cuffed his hands behind his back, carried him into the living room, and placed him on a couch, with his genitals exposed. No effort was made to obtain clothing or any covering for

him. His room was then searched, but no weapons or contraband were found.

At some point after the officers transported Curry to the living room, he complained that the handcuffs hurt his wrists and that he was cold and tired from sitting upright on the couch. His hands were recuffed in front of his body and he was given a blanket. However, he was not allowed to return to his bed for over two hours, until after the search of the entire house had been completed, even though the officers had finished their unproductive search of Curry's bedroom approximately an hour earlier.

## II.

■ The Fourth Amendment proscribes only "unreasonable" searches and seizures. However, the reasonableness of a search or a seizure depends "not only on *when* it is made, but also on *how* it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (emphasis in original). In other words, even when supported by probable cause, a search or seizure may be invalid if carried out in an *unreasonable* fashion. We review a district court's determination of reasonableness *de novo*. *See United States v. McConney*, 728 F.2d 1195 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ Whether an otherwise valid search or seizure was carried out in an unreasonable manner is determined under an objective test, on the basis of the facts and circumstances confronting the officers. The Supreme Court and this court have discussed the factors relevant to that objective test primarily in cases involving police use of excessive force in making stops or arrests. *See, e.g., Graham v. Connor*, 490 U.S. 386, 387, 109 S.Ct. 1865, 1867, 104 L.Ed.2d 443 (1989); *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir.1991). In *Graham*, a case in which officers used excessive force in mak-

---

1. Defendant Foxworth testified that Curry "was suffering from some type of medical disability and was not asked if he understood his rights nor was he subsequently interviewed."

Defendant Billesbach testified that Curry was "an elderly gentleman ... and he was not very mobile ... He appeared to be ill."

Defendant Justus testified that Curry "seemed kind of skinny and he seemed like he had a physical disability, like it was difficult for him to get up and walk."

ing an investigatory stop of a diabetic, the Supreme Court stated that determining the reasonableness of a seizure "requires careful attention to the facts and circumstances *of each case,* including the severity of the crime at issue, whether the suspect poses an *immediate threat* to the safety of the officers or others, and whether he is *actively resisting arrest* or attempting to *evade arrest* by flight." *Id.* at 396, 109 S.Ct. at 1872 (emphasis added). The inquiry is not limited to the specific *Graham* factors, however. Rather, we must look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham,* and then must consider "whether the *totality* of the circumstances justifies a particular sort of seizure." *Id.* (emphasis added), *quoting Garner,* 471 U.S. at 8–9, 105 S.Ct. at 1700.

■ Unlike *Graham,* the case before us does not involve the reasonableness of the force used to make an arrest or an investigatory stop. However, as *Garner* makes clear, the test of "reasonableness" applies to the manner in which the police conduct *any* seizure, including limited detentions of the type imposed on the occupants of the Curry–Franklin residence by the Portland Police. In addition, the test is applicable to other forms of police conduct, and not just to the use of force. In *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981), the Supreme Court stated that for Fourth Amendment purposes, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (Footnotes omitted). However, the Court included a caveat: "[S]pecial circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case...." *Id.* at n. 21, 101 S.Ct. at 2595. The conclusion we draw from *Summers* and the other applicable Supreme Court precedent is that, while detentions of occupants during the period of a search will under most circumstances prove to have been reasonable, a detention may be unreasonable in a particular instance either because the detention itself is improper or because it is carried out in an unreasonable manner.

Here, we can assume that some form of detention of Curry was appropriate. The question is whether the *manner* in which the Portland police carried out that detention was reasonable. Our assessment of the reasonableness of the *manner* of detention imposed in connection with the execution of a search warrant involves a number of considerations that are similar, although not identical, to those involved in determining the reasonableness of the manner in which police effect an arrest. The factors identified in *Graham*—the severity of the crime, whether the person being detained poses an immediate threat, whether he is actively resisting or attempting to flee—may be helpful in the conduct of our inquiry, but so may other factors not ordinarily relevant in deciding how much force is appropriate when making an arrest. There is a basic difference between the two categories of cases. Persons being arrested are ordinarily suspected of having committed serious, often violent, offenses. Persons being detained while a search of a house is being conducted may simply be visiting a home or business for an innocuous if not benevolent purpose.

■ A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy. Detentions, particularly lengthy detentions, of the elderly, or of children, or of individuals suffering from a serious illness or disability raise additional concerns. Of course, the presence of any of these factors in an individual case does not establish that the detention is unreasonable *per se.* Rather, these factors, along with the *Graham* elements and any other circumstances relevant to an individual case, must be assessed in their totality.

■ Here, we have an example of the unusual case contemplated by *Summers.* It is clear, in light of the district court's findings of fact, that the officers executing the search warrant at the Curry–Franklin home acted unreasonably. They executed the warrant in an unreasonable manner, first by removing a gravely ill and semi-naked man from his sickbed without providing any cloth-

ing or covering, and then by forcing him to remain sitting handcuffed in his living room for two hours rather than returning him to his bed within a reasonable time after the search of his room was completed. None of the officers had any reason to believe, on the basis of the information they had prior to the search or their observations once in the house, that Curry had committed a crime, or that he was armed. In fact, the officers were not even aware that Curry lived in the house prior to executing the warrant. It should also have been clear to them that Curry was not a gang member. Finally, it should have been obvious to the officers that Curry presented little risk of danger to them, that he presented absolutely no risk of flight, and that it was highly unlikely that he could interfere with their search in any way.

We note that we must determine the reasonableness of Curry's detention "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. However, there is no dispute that the officers were aware of Curry's disability. After the police entered the home they were immediately put on notice of Curry's physical condition by Franklin. Although the officers were entitled not to believe Franklin initially, they admitted that their own observations quickly corroborated her statements. On the basis of those observations, the officers determined that Curry could not walk or sit up unassisted, and that as a result it was necessary for them to carry him to the living room.

The officers and the City of Portland contend that their treatment of Curry was reasonable because it is the "custom and practice of the Portland Police Bureau not to release [detainees] from their restraints until the search [of the entire premises] has been completed." This argument simply ignores the warning in *Summers* that detaining persons present at the premises for the duration of a search may be unreasonable in certain circumstances. Such circumstances are amply demonstrated here, where it is not only the length of the detention but also the treatment afforded the detainee during the detention that offends constitutional principles. First, we can conceive of *no* reason why

Curry was not given clothing or covering before he was carried from his bed to the living room, so that his genitals would not be exposed to the view of 23 armed strangers. Given the officers' immediate apprehension of Curry's disability, and the fact that the other residents of the home were quickly seized, handcuffed, and taken to that central location, no exigency existed that could reasonably have justified the officers' failure to permit Curry to preserve some small measure of his privacy and dignity. *Cf. Sepulveda v. Ramirez*, 967 F.2d 1413 (9th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 342, 126 L.Ed.2d 307 (1993); *York v. Story*, 324 F.2d 450, 454–56 (9th Cir.1963), *cert. denied*, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964).

There is also no justification for the officers' failure to return Curry to his bed after the search of his room had been completed. Again, the officers admitted at trial that they were aware of Curry's disability early in the course of their activities. The officers testified that they knew that Curry presented absolutely no risk of flight. Based on this knowledge, it must have been apparent to a reasonable officer that Curry presented no serious threat to the officers or to the conduct of the search. Certainly it must have been apparent that returning him to his sickbed would involve no risk at all once the officers had searched his room and made certain that there were no weapons or contraband present. However, even had Curry represented some residual threat if left wholly unattended, there was no reason why he could not simply have been taken back to bed and guarded by one or two of the *twenty-three* armed officers involved in the operation. The two other persons present in the residence when the raid occurred had been handcuffed and were confined to the living room. Surely, one or two officers could have been spared from their other duties to stay with Curry, had Foxworth, the officer in charge, deemed such a precaution necessary. For that matter, all three of the residents could have been held in Curry's sick room and guarded there. The city's policy is to move all residents to a central location. Nothing suggests, however, that it was necessary that the central location be the living room.

We emphasize that it is not the fact that there was a more reasonable alternative available that leads us to our conclusion. It is the fact that the officers conducted the detention of Curry in a wholly unreasonable manner—a manner that wantonly and callously subjected an obviously ill and incapacitated person to entirely unnecessary and unjustifiable degradation and suffering. Even had Curry been thought to have been guilty of criminal behavior, we would be required to reject such conduct on the part of individuals sworn to uphold the law. Given the circumstances of this case, the violation was egregious and the injuries substantial.

We reverse and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.

REINHARDT, Circuit Judge, concurring:

Rather than simply remanding for further proceedings, I would prefer to decide two additional matters. I believe that we should make it clear that 1) the officers are not entitled to qualified immunity, and 2) the City of Portland (as well as the officers) is liable for the unlawful conduct. My colleagues prefer not to address those questions. I believe, however, that our failure to do so does a disservice to the parties—and particularly to Mr. Curry, the individual whose constitutional rights were so flagrantly violated.

The district court has already erred once in holding that the detention of Curry did not violate his Fourth Amendment rights, necessitating an appeal and a remand for further proceedings. By leaving certain legal questions unresolved, we make possible at least two additional appeals, one of which is wholly unnecessary. I refer, of course, to the appeal that would ensue should the district court find the officers entitled to qualified immunity and the City not liable for the officers' unconstitutional conduct. Unlikely as it is that the district court would reach those clearly erroneous results, I would prefer not to take the risk. The consequences are too serious—for Mr. Curry and our system of justice. If the district court again errs with respect to liability, we would first have to reverse that decision and then order the district judge to make the necessary and long-delayed damage determination. There would then still remain the distinct possibility of another appeal from the damage ruling by either or both parties. By the time we decided *that* appeal, it might well be six to nine years from the time the police violated Curry's rights.

There is no necessity at all for so absurd and protracted a process in this case. The questions of qualified immunity and the liability of the City are, at this stage of the proceedings, solely legal in nature. They can readily be resolved on the basis of the facts found by the district court and affirmed in our opinion. There is simply no reason to send Mr. Curry bouncing back and forth between the district court and this court, certainly not for the sake of allowing the district court to decide purely legal questions that we are equally capable of deciding and that it is our ultimate responsibility to resolve. Our half-decision in this case is reminiscent of the conduct and attitudes of the courts in *Jarndyce v. Jarndyce.* Charles Dickens, Bleak House (E. Johnson ed., 1965) (1853). *See Coe v. Thurman,* 922 F.2d 528, 530 n. 2 (9th Cir.1990). We appear not to have learned much since the days of Dickens. Compensation for injuries, constitutional or otherwise, should be made available to an injured person while he is still alive, not after he can no longer possibly benefit from the award. Remanding the case of a sick elderly man to the district court for the determination of purely legal issues reflects an odd understanding indeed of the manner in which the judicial system should operate and the relationship between law and justice.

It is true, as my colleagues would point out, that generally we will not consider issues that have not been raised before the district court. *Bolker v. C.I.R.,* 760 F.2d 1039, 1042 (9th Cir.1985). It is also true that because of the fundamental constitutional error it made the district court only decided the question of the legality of the officers' conduct and failed to reach the other questions affecting liability. However, "when the issue is purely one of law and either does not depend on the factual record developed below or the pertinent record has been fully developed," we

recognize an exception to the rule which serves to incapacitate my colleagues here. *Id.* In such instances, we have discretion to resolve the issue notwithstanding the district court's failure to decide it below. *See also Quinn v. Robinson,* 783 F.2d 776, 814 (9th Cir.1986); *United States v. Gabriel,* 625 F.2d 830, 832 (9th Cir.1980). That, in my opinion, is what we are, without question, required to do in this case.

Turning to the two issues that could result in unnecessary appeals, I would note first that we hold, in our principal opinion, that the officers' treatment of Curry violated his Fourth Amendment rights. Thus, unless the three officers are shielded by qualified immunity, they are individually liable for this violation—Sergeants Justus and Billesbach as the persons who detained Curry, and Sergeant Foxworth as the individual in charge of the search and seize operation.

In my opinion, the officers are clearly not entitled to immunity, qualified or otherwise. The question whether qualified immunity applies in this case, like all other questions of qualified immunity, "turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (internal cites and quotation marks omitted). Specific precedent declaring the particular conduct involved unlawful is not required in order to foreclose a qualified immunity defense; rather, the "law" in question need only be sufficiently clear that a reasonable official would not fail to perceive it. We have recently stated expressly that this principle applies in the case of officers who are implementing policies in an improper manner. In *Chew v. Gates,* 27 F.3d 1432, 1474 (9th Cir. 1994), we said that an officer who unlawfully implements a policy "in an egregious manner or in a manner which clearly exceeds the reasonable bounds of the policy is not entitled to qualified immunity, whether or not there is a case on point declaring such actions unconstitutional." In other words, even in the absence of relevant case law, if the manner of implementation of an otherwise constitutional policy is not only unconstitu-

tional but clearly so, the officer "will be deemed to have violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id., quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The patent, egregious violation of Curry's constitutional rights in the case before us defeats any possible claim that the officers are entitled to qualified immunity. In view of the undisputed facts, it is clear that *no* officer—reasonable or otherwise—could have believed that the police behavior here would pass constitutional muster. In short, the officers who removed a seriously ill, visibly incapacitated, and semi-naked man from his bed—a man who was suspected of nothing and presented no threat to the officers—and placed that man on a couch in his living room, uncovered, with his genitals exposed, and then subsequently kept him there for more than two hours, should have known that their conduct was unconstitutional. Thus, I would hold today, rather than several years from now, that the officers cannot shield themselves from liability by contending that their implementation of the City of Portland's policy was conducted in good faith.

I would also hold today, not later, that because the violation of Curry's Fourth Amendment rights was inflicted pursuant to city policy, regulation, custom, or usage, the City of Portland is subject to municipal liability under *Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Once again, the law is clear. Under *Monell,* it is not necessary that the city policy contemplate that it will be implemented in the manner in which it is enforced by the officers involved. It is sufficient to warrant the imposition of liability on the City that it was the officers' attempt to enforce the City's policy that was the cause of the constitutional violation. *See Jackson v. Gates,* 975 F.2d 648, 654 (9th Cir.1992) (city policy "need only cause [the] constitutional violation; it need not be unconstitutional per se."). Of course, a municipality cannot be held liable solely because it employs a tortfeasor—there must be an official policy, custom or usage that causes

the plaintiff's constitutional deprivation. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. It is clear that such an official policy existed in this case. It is also clear that this policy caused the deprivation of Curry's constitutional rights.

In sum, in addition to holding that the three Portland police officers violated Curry's Fourth Amendment rights, I would hold that they are not entitled to qualified immunity, and that the City of Portland as well as the officers are liable for the unconstitutional conduct. Accordingly, I would reverse the judgment of the district court and remand solely for a determination of damages.

BRUNETTI, Circuit Judge, concurring:

I agree with the result reached by the majority; however, I write separately to limit my holding to the unreasonableness of the officers' conduct in detaining Curry in a semi-nude condition while they executed a search warrant.

In this case, 23 members of the Portland Police Bureau, under the direction of defendant Foxworth, executed a valid search warrant based on probable cause at the home where Curry lived. The basis for this warrant was a tip that the home was a distribution center for cocaine and that members of the household were part of the "Bloods" gang. Information also revealed that Franklin had purchased two guns. Executing the warrant, the police officers broke various windows in the residence as a diversionary tactic and knocked and announced their presence at the same time that they used a battering ram to break open the door. Curry does not contest the validity of the warrant or the officers' manner of entry into the home.

Once inside, the officers split up over the three floors in the house to locate all the occupants and bring them to a central location. It is the custom and practice of the Portland Police Bureau to bring the occupants to a central location in order to secure them as quickly as possible to prevent them from arming themselves and confronting the officers, especially in narcotics cases in which persons involved are often armed and dangerous. In their search, the officers discovered three occupants and brought them all into the living room.

Two officers, defendants Billesbach and Justus, seized Curry from his bedroom, handcuffed him behind his back, brought him to the living room, and sat him on the couch. These officers recognized immediately that Curry was ill. Officer Billesbach observed Curry as "an elderly gentlemen, appeared to be elderly anyway, and he was not very mobile.... He appeared to be ill." Officer Justus observed Curry in bed and testified that "[h]e seemed ... kind of skinny and he seemed like he had a physical disability, like it was difficult for him to get up and walk." Once in the living room, Officer Foxworth did not attempt to interrogate Curry because he "was suffering from some type of medical disability and was not asked if he understood his rights nor was he subsequently interviewed." In addition, Franklin warned the officers not to move Curry because he was a sick man.

In the living room, Curry complained about his wrists hurting him and being cold and tired from sitting on the couch. After some time, the officers changed his handcuffs so that his wrists were cuffed in front and brought a blanket to cover him. They did not allow him to return to his bedroom until after they concluded the search two hours later.

Testimony at trial revealed that as a result of multiple sclerosis, Curry had been unable to walk for several years. He had to be carried to the toilet, and because of his inability to control his bowels, he wore only a t-shirt to bed. At the time of the search, Curry was unable to sit up in bed without assistance and could not feed himself. Also at this time, Curry could not walk at all and had to be carried everywhere inside the house and was moved by wheelchair outside.

On the basis of these facts, I must decide whether the manner in which the officers executed the search and seizure of Curry was reasonable. *See Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1988) (reasonableness under the Fourth Amendment is determined according to "the facts and circumstances of

each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight").

I find that despite Curry's illness, the officers were justified in moving Curry from his bed to the couch and detaining him in the living room for the duration of the search, pursuant to police practice. Officer Billesbach testified that this action was necessary to secure the premises and to conduct a thorough search of Curry's bedroom, since there could have been drugs or guns hidden in or around the bed. He also stated that they could not return Curry to his bed after the officers searched that room, because they might have had to search the room again and because clothes were out on his bed. This was reasonable conduct from the perspective of the officers at the time, considering the information in the warrant that the police had probable cause to believe that there were drugs, guns, and gang activity at the house. *See id.* ("reasonableness" "judged from perspective of reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). As the Supreme Court stated in *United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985) (citations and internal quotations omitted),

> A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

Here, the majority substitutes its judgment for that of the police who faced a potentially dangerous situation; this I cannot do.

However, upon balancing the nature and quality of the intrusion on Curry's Fourth Amendment rights against the importance of the governmental interests alleged to justify the intrusion, I can say that I believe that the manner in which the officers treated Curry during the detention was unreasonable, making this an unusual case in which special circumstances render the detention unreasonable. *See Michigan v. Summers,* 452 U.S. 692, 705 n. 21, 101 S.Ct. 2587, 2595 n. 21, 69 L.Ed.2d 340 (1981) ("special circumstances, or possibly a prolonged detention, might lead to [the conclusion that a detention during a search is improper] in an unusual case"). Based on the specific facts and circumstances, the intrusion into Curry's privacy was great; this was *after* the officers recognized that he did not pose an immediate threat to their or others' safety and that because of his illness, he could not actively resist arrest or attempt to evade arrest by flight. The officers acted unreasonably in failing to cover the semi-nude Curry during the prolonged search.

Officer Billesbach testified about the policy of the police to bring a person back to the bedroom and properly clothe that person if he or she is brought out of the bedroom with his or her genitals exposed. He also stated that there is no exception to that rule. Officer Justus testified about this policy as well, stating that the police would dress someone they found not clothed during a search. When asked whether it would have not been pursuant to practice if Curry had been brought out to the living room and was nude from the waist down, Officer Justus replied, "[r]ight. We would have put something on him."

Based on the disputed testimony in this case, it appears that the officers did not follow that policy. Franklin, Curry's caretaker for almost 22 years, testified that Curry "own[ed] nothing come passed the waist." She stated that when he was sitting on the couch, he was wearing "[n]othing but a top. His penis and his buttocks, he was sitting on, he was exposed." The court said that it was "prepared to find that he did not have a nightshirt covering his genitals." The testimony of Officers Billesbach and Justus is

contradictory in itself. Officer Justus testified that Curry was wearing "real baggy pants or pajamas." Officer Billesbach, however, testified that "Curry was wearing a nightshirt" that "came down to the middle of his thigh" and did not "recall him wearing trousers." In light of this disputed testimony and the police's policy to clothe individuals brought out of bed because of a search, it appears that the officers did not observe this policy when they brought Curry from his bedroom to the living room and forced him to sit on the couch during the search with his genitals exposed. That conduct of the officers was unreasonable and rendered the detention improper.

Moreover, the officers left Curry on the couch uncovered with his hands cuffed behind his back for a considerable amount of time, while Curry complained through Franklin that he was uncomfortable and cold. It was not until an hour after bringing Curry to the couch that the officers brought Curry a blanket and moved his handcuffs from the back to the front. This attempt to ameliorate the situation does not vitiate the fact that the officers brought him semi-nude to the couch and left him there unclothed for one hour.

I therefore concur with the result in the majority's opinion that the district court improperly dismissed Curry's suit. I limit my holding to the fact that the officers acted unreasonably in the manner in which they detained Curry by forcing him semi-nude from his bedroom to the living room where he sat on the couch with his genitals exposed.