Iris MENA, Plaintiff–Appellee,

and

Jose E. Mena, Plaintiff,

v.

CITY OF SIMI VALLEY; Randy G. Adams; Marvin Hodges; Roy Jones; Vincent Allegra; Alan McCord; Richard Thomas; Ronald Chambers; Wil-

---

liam Lappin; Arnold Baynard; Jeffrey Dominick; Jack Greénburg; Richard Lamb; Frank Ahlvers; John Adamczyk; Tim Brown, Defendants,

and

Darin L. Muehler; Robert Brill, Defendants–Appellants.

No. 01–56673.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 2003.

Filed June 23, 2003.

Paul L. Hoffman, Schonbrun, DeSimone, Seplow, Harris, & Hoffman, Venice, CA, and James S. Muller, Los Angeles, CA, for the plaintiff-appellee.

Before PREGERSON and REINHARDT, Circuit Judges, and ARCHER,[1] Senior Circuit Judge.

## OPINION

PREGERSON, Circuit Judge.

Iris Mena brought this action in the district court under 42 U.S.C. § 1983, alleging that Robert Brill and Darin L. Muehler, both City of Simi Valley police officers, used excessive force and restrained her for an unreasonable period of time during a search of her home. The officers appeal the district court's judgment entered on a jury verdict. They argue that the district court erred in ruling that they are not entitled to qualified immunity. Additionally, the officers contend that they are entitled to a new trial on the unlawful detention claim because the district court abused its discretion (1) in denying the officers' proposed instruction on unlawful detention; (2) through its conduct during voir dire; and (3) through its cross-examination of defense witnesses during trial. The officers also argue that the award of punitive damages to Mena should be vacated as unsupported by substantial evidence. We have jurisdiction to hear this appeal under 28 U.S.C. § 1291, and we affirm.

### Facts and Procedural Background

Just before 7:00 a.m. on February 3, 1998, several officers from the Simi Valley Police Department (SVPD) SWAT team

Karen K. Peabody, Nye, Peabody, & Sterling, LLP, Santa Barbara, CA, for the defendants-appellants.

---

1. The Honorable Glenn L. Archer, Jr., Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

executed a valid search warrant at 1363 Patricia Avenue. Brill and Muehler were directly responsible for supervising the search. The police officers searched the residence as part of their investigation of a gang-related drive-by shooting. The officers believed that Raymond Romero, the officers' primary suspect, was residing in the house, a single-family dwelling housing many unrelated residents. Iris Mena was a resident in the house, which was owned by her father, Jose Mena. The police officers forcibly entered the residence and observed that some of the rooms were locked, many with padlocks on the outsides of the doors. The officers proceeded to force entry into these locked rooms, including the bedroom in which Mena was sleeping. The officers, wearing SWAT team paraphernalia, found Mena in bed, and, pointing a submachine gun at her head, turned her over onto her stomach and handcuffed her. After searching her person and her room, the officers led Mena—barefoot and still wearing her pajamas—outside through the rain to a cold garage. Although she was absolutely compliant, the officers detained Mena in handcuffs for approximately two to three hours. While the police officers held Mena in the garage, the officers did not explain to her the reason she was being detained. During her detention, an immigration officer who had joined the police on the search asked Mena questions concerning her citizenship status. Upon learning from Mena that her citizenship documentation was in her purse, a police officer searched her purse without her consent. The police officers did not release Mena from the handcuffs until after they completed the search of the premises, at which time they finally informed her why she had been detained.

On October 19, 1998, Mena brought an action under 42 U.S.C. § 1983, alleging that the police officers violated her civil rights in connection with the February 3, 1998, search of her home. Specifically, she contended that (1) the search warrant and search were overbroad; (2) the officers detained Mena unlawfully; (3) the officers detained her in an unreasonable manner; and (4) the officers failed to comply with the "knock and announce" rule before entering the house. The defendants moved for summary judgment on the ground that Mena's constitutional rights were not violated, or, alternatively, that the officers were entitled to qualified immunity. On August 10, 1999, the district court issued an order denying summary judgment, holding that because "a reasonable trier of fact could conclude that the warrant and/or its execution was 'overbroad'" and "a reasonable trier of fact could conclude that Iris Mena's detention was unreasonable," defendants were not entitled to qualified immunity as a matter of law. The officers appealed, and we affirmed, except as to the claim that the warrant was overbroad on its face. *See Mena v. City of Simi Valley*, 226 F.3d 1031 (9th Cir.2000) (*Mena I*). On that claim, we reversed and remanded for the entry of summary judgment in favor of the appellants. *Id.* at 1037–38.

On June 12, 2001, trial began on Mena's Fourth Amendment claims. On June 21, 2001, the trial concluded and the jury returned a verdict finding that Muehler and Brill violated Mena's Fourth Amendment right to be free from unreasonable seizure by detaining her with unreasonably excessive force and for a longer period than was reasonable. The jury found Muehler and Brill each liable to Mena in the amount of $10,000 in compensatory damages and $20,000 in punitive damages. On July 11, 2001, the district court entered judgment against Muehler and Brill.

During trial, the Supreme Court decided *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), in which the Court clarified the proper approach to

evaluating claims of qualified immunity. On July 25, 2001, the defendants filed a motion to alter or amend the judgment under Fed.R.Civ.P. 59(e) based on a purported intervening change in qualified immunity law; for a new trial under Fed. R.Civ.P. 59(a) on the ground that the district court's jury instruction on unlawful detention was legally erroneous; and for judgment as a matter of law under Fed. R.Civ.P. 50(b) based on an asserted lack of evidence to substantiate the jury's punitive damages award. The district court denied that motion, and the officers now appeal.

## Discussion

### I. Qualified Immunity

Muehler and Brill argue that they should be shielded from liability to Mena under the doctrine of qualified immunity.[2] "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier*, 533 U.S. at 200, 121 S.Ct. 2151; *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The central interest that underlies the doctrine of qualified immunity is that "officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Although this court has already affirmed the district court's pre-trial determination that the officers were not entitled to qualified immunity with respect to the claim of unlawful detention, *inter alia*, *Mena I*, 226 F.3d at 1039–41, the officers argue that *Saucier* effected an intervening change in the law sufficient to amend our earlier decision and dismiss the excessive force claims based on qualified immunity.

Under *Saucier*, the first step in determining whether an official is entitled to qualified immunity is to consider whether the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. *Saucier*, 533 U.S. at 200–01, 121 S.Ct. 2151; *accord Robinson v. Solano County*, 278 F.3d 1007, 1012 (9th Cir.2002) (en banc). Assuming a constitutional violation could be established on a favorable view of the plaintiff's submissions, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. But "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Because law as to what is considered reasonable develops over time, courts must determine whether the law was clearly established at the time of the alleged constitutional violation. *Robinson*, 278 F.3d at 1013 (noting that "the law at that time must be our guide").

### A. Whether Mena Asserts a Violation of a Constitutional Right

To evaluate the officers' claim that they are entitled to qualified immunity, we

---

**2.** We review de novo a district court's decision regarding qualified immunity. *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019,

127 L.Ed.2d 344 (1994); *Robinson v. Prunty*, 249 F.3d 862, 865–66 (9th Cir.2001).

first accept the facts as Mena alleges them and determine whether those facts point to a constitutional violation. According to Mena, at least eighteen members of the Simi Valley Police Department (SVPD) SWAT team forcibly gained entry into her home just after dawn on February 3, 1998. Awakened abruptly by a loud noise, Mena opened her eyes to find "a person dressed in black pointing a gun with a light on top" at her face. Mena, especially startled in her sleepy haze, assumed that the individual wearing dark clothes and a balaclava[3] and pointing an MP–5 submachine gun at her head had come in "to rob and kill" her. Mena emphasizes that throughout this initial encounter no person identified himself as a police officer. Not until an officer pushed Mena onto her bed, face down, and placed handcuffs on her was she able to *infer* that these were police officers, because she assumed that police officers are "the only persons that put handcuffs on people." The officers searched Mena and her room, yanked her up from her bed by her shirt, and led her out of her room in her pajamas. Although it was raining outside and Mena was barefoot, the officers directed her outside and into a cold garage, where she was detained for two to three hours.

■ During her detention, an officer questioned Mena about her citizenship status. Following that, an INS agent who accompanied the SVPD on the search asked her more specific questions about her immigration status. Although Mena was a legal resident of this country at the time, the INS agent asked her where her immigration documentation was, and upon learning that the papers were in her purse, a police officer proceeded to search it without her consent. The police officer then turned the papers over to the INS agent, who subsequently inspected them.

On these facts, there is no doubt that Mena has alleged a violation of her constitutional rights under the Fourth Amendment. The Fourth Amendment protects citizens from unreasonable government seizures. U.S. Const. amends. IV, XIV; *Camara v. Municipal Ct.*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). To succeed on a claim of unreasonable search or seizure under the Fourth Amendment, a plaintiff must show (1) the existence of a search or seizure and (2) that the search or seizure was unreasonable or conducted in an unreasonable manner. U.S. Const. amend IV. There is no dispute that Mena's detention was a seizure. We therefore must consider—based on the evidence most favorable to Mena—whether her detention was reasonable.

■ To evaluate claims of unreasonable seizures and detentions in the course of an arrest, investigatory stop, and other seizures of an individual, we apply the "objective reasonableness" standard the Supreme Court adopted in *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In addition to weighing factors "including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," *id.* at 396, 109 S.Ct. 1865, a court must consider whether a detention during a search "is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994).[4] In evaluating whether an officer's conduct is reasonable, we pay "careful attention to the facts and circum-

---

**3.** A sophisticated type of ski mask, a balaclava conceals the features of the face during a SWAT raid. The SWAT officers also wore helmets and goggles.

**4.** Although the standard under which individ-

stances of each particular case," *Graham,* 490 U.S. at 398, 109 S.Ct. 1865, and analyze the facts and circumstances of the search or seizure "in their totality," *Franklin,* 31 F.3d at 876.

▉ In this case, the officers were investigating a gang-related drive-by shooting—clearly a serious crime. They were authorized under a warrant to search the Mena home and seize property in relation to their investigation of Raymond Romero, the officers' primary suspect. Mena, however, was not the subject of this investigation.[5] Moreover, it was clear that Mena posed no "immediate threat to the safety of the officers or others." *See Graham,* 490 U.S. at 398, 109 S.Ct. 1865. Nor did she actively resist arrest or attempt to flee. *See id.* Mena had been asleep in her pajamas when the police entered her room. She was unarmed, docile, and cooperative in every respect.

Yet, although searches of Mena's person and room produced no evidence of gang membership or contraband and eighteen well-armed SWAT team officers secured the house in a matter of minutes, the officers handcuffed Mena and kept her in

handcuffs for two to three hours. By any standard of reasonableness, in light of the fact that Mena was not a suspect in the crime, the officers should have released her from the handcuffs when it became clear that she posed no immediate threat[6] and did not resist arrest—much less resist arrest "actively."[7] Moreover, because Mena was not a suspect, the police should not have subjected her to any of the heightened security measures police officers employ while detaining persons suspected of being violent criminals—such as physical roughness, threatening deadly force, and using handcuffs for an extended period. Although we recognize that police officers are expected "to make split-second judgments"[8] in "difficult and tense"[9] situations, it strains reason to justify the necessity—in these factual circumstances—of pointing a machine gun at Mena's face, roughly jerking her off of her bed, marching her barefoot through the rain into a cold garage, and keeping her in handcuffs for several hours. We thus have no trouble in concluding that her detention was objectively unreasonable and "unnecessarily . . . degrading [and] prolonged." *Franklin,* 31 F.3d at 876.[10] Thus, Mena

uals may assert qualified immunity also bears a reasonableness component, the Supreme Court in *Saucier* directs us to consider excessive force claims and assertions of qualified immunity separately. *Saucier,* 533 U.S. at 204–06, 121 S.Ct. 2151.

5. In *Franklin,* we distinguished between (1) persons who are arrested, who "are ordinarily suspected of having committed serious, often violent, offenses," and (2) persons who are incidentally detained during a search of a residence, who "may simply be visiting a home or business for an innocuous if not benevolent purpose." 31 F.3d at 876. Although Mena was a resident of the house and not a visitor, she plainly falls into the latter category.

6. Indeed, both a SWAT commander and one of the defense's expert witnesses testified that non-suspect detainees who pose no threat to

police officers or others should be released from handcuffs.

7. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (directing courts to consider, *inter alia,* whether a suspect "actively resist[s] arrest"); *see also Franklin,* 31 F.3d at 877 (finding that continuing to hold a detainee in handcuffs after a residence has been secured when there were sufficient officers present to maintain security was unreasonable).

8. *See Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865.

9. *See Liston v. County of Riverside,* 120 F.3d 965, 977 (9th Cir.1997).

10. The officers attempt to distinguish Franklin from the facts of this case by emphasizing that Curry (the plaintiff in *Franklin* ) was sick-

**1264**

has asserted a violation of a constitutional right.

■ Furthermore, we note with particular emphasis that the officers unduly invaded Mena's privacy by inquiring unnecessarily into her citizenship status. The officers did so presumably because of Mena's apparent Hispanic/Latino ethnicity, because there was no reason evident in the record to be suspicious of her citizenship status. On these facts alone, we observe that Mena has alleged a violation of a constitutional right.

■ We recognize that Congress has conferred INS agents limited authority to interrogate those who are or are believed to be undocumented immigrants.[11] But this power may not exceed the restraints on governmental intrusion the Fourth Amendment guarantees. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 878–84, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Zepeda v. INS,* 753 F.2d 719, 726–27 (9th Cir.1983). Thus, an INS agent must have a *particularized reasonable suspicion* that an individual is not a citizen to interrogate that individual regarding his citizenship. *Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. 2574 (holding that the Fourth Amendment "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens").

In *Brignoni–Ponce,* the Supreme Court affirmed a judgment of this court, and held that the U.S. Border Patrol policy of allowing its agents to stop vehicles in the border area without any reason to suspect

illegal activity was unreasonable under the Fourth Amendment. *Id.* In that case, two Border Patrol officers stopped Brignoni Ponce's vehicle and questioned him and his two passengers. The Supreme Court noted that "the officers relied on a single factor to justify stopping [Brignoni–Ponce's] car: the apparent Mexican ancestry of the occupants." *Id.* at 885–86, 95 S.Ct. 2574. The Court held that Hispanic/Latino appearance alone "would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country." Thus, while the Court observed that "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor," it held that Mexican appearance alone cannot justify stopping drivers who appear to be of Mexican descent to inquire about their citizenship status. *Id.* at 887–88, 95 S.Ct. 2574.

In *United States v. Montero–Camargo,*[12] we observed that "in suggesting that ethnic appearance could be relevant" to an immigration agent's decision whether to detain and question an individual regarding citizenship status, "the [*Brignoni–Ponce* ] Court relied heavily on now-outdated demographic information." 208 F.3d at 1132–35. Because demographics had shifted dramatically in the twenty-five years between the *Brignoni–Ponce* decision and our decision in *Montero–Camargo,* we noted-citing revised data from the U.S. Census Bureau—that the "statistical premises" on which the Supreme Court based its dictum suggesting that ethnic

---

ly and Mena was not. But we clearly stated in *Franklin* that an individual's frail health raised "additional concerns" in the overall reasonableness analysis. *See Franklin,* 31 F.3d at 876 (listing "additional" concerns—such as detentions of the elderly, children, or individuals "suffering from a serious illness or disability"—beyond whether a search "is unnecessarily painful, degrading, or pro-

longed, or if it involves an undue invasion of privacy").

**11.** 8 U.S.C. § 1357(a)(1).

**12.** 208 F.3d 1122 (9th Cir.2000) (en banc), *cert. denied sub nom., Sanchez–Guillen v. United States,* 531 U.S. 889, 121 S.Ct. 211, 148 L.Ed.2d 148 (2000).

appearance may be a relevant factor "are no longer applicable. The Hispanic population of this nation, and of the Southwest and Far West in particular, has grown enormously—at least five-fold in the four states referred to in the Supreme Court's decision." [13] *Id.* at 1133. To reconcile the shift in the ethnic makeup of the nation's population with the Fourth Amendment's requirement of individualized reasonable suspicion, we concluded that "[r]easonable suspicion requires particularized suspicion, and in an area in which a large number of people share a specific characteristic, that characteristic casts too wide a net to play any part in a particularized reasonable suspicion determination." *Id.* at 1134–35 (footnotes omitted and emphasis in original).[14] Thus, we held that immigration officials may not use Hispanic/Latino appearance as a factor in determining whether a particularized reasonable suspicion exists to justify stopping and questioning an individual regarding his citizenship.

In this case, both the police officer [15] and the INS agent questioned Mena about her

---

**13.** The *Brignoni–Ponce* Court cited information from the 1970 Census and INS alien registration statistics for the States of California, New Mexico, Texas, and Arizona. *See Brignoni Ponce*, 422 U.S. at 886 n. 12, 95 S.Ct. 2574.

**14.** *See also Montero–Camargo,* 208 F.3d. at 1134 n. 21 & n. 22 (noting that the holding in that case did not "preclude the use of racial or ethnic appearance as *one* factor relevant to reasonable suspicion or probable cause when a particular suspect has been identified as having a specific racial or ethnic appearance [but such an individual] may not be stopped and questioned because of appearance, unless there are other individualized or particularized factors which, together with the racial or ethnic appearance identified, rise to the level of reasonable suspicion or probable cause").

**15.** Aside from the conspicuous lack of a particularized reasonable suspicion, it is doubtful that the police officer had any authority to question Mena regarding her citizenship. Agents of the INS have limited authority. to question and detain an individual suspected of being an illegal alien, so long as they have a particularized reasonable suspicion that the individual is in fact an illegal alien. 8 U.S.C. § 1357(a). But the basis for a local police officer to assert such authority is questionable.

Under 8. U.S.C. § 1357(g), the INS may enter into an agreement with a local law enforcement agency under which local law enforcement officers are granted limited authority to investigate, apprehend, or detain undocumented immigrants. Such agreements are subject to many requirements. *See*

8 U.S.C. § 1357(g)(1–10). It is not clear from the record whether the Simi Valley Police Department has entered into such an arrangement. If they have not, the officer who questioned Mena regarding her citizenship improperly assumed such authority. Because the record does not account for the lack or existence of an agreement under 8 U.S.C. § 1357(g) and in any event, as we will explain, the officer violated Mena's Fourth Amendment rights by questioning her citizenship status, we do not express a judgment as to whether the officer was properly vested with the authority to question and detain individuals properly suspected of being undocumented immigrants.

Another law affords local law enforcement officials limited authority to detain and question individuals regarding their immigration status. Subject to the Fourth Amendment, under 8 U.S.C. § 1252c(a), a state or local law enforcement official may arrest and detain an individual if (1) he is illegally present in the United States; (2) he has previously been convicted of a felony in the United States and since left the country or was deported; (3) the state or local law enforcement official obtains "appropriate confirmation" from the INS of the immigration status of the individual; and (4) the state or local law enforcement official only detains the individual for as long as is reasonably required for the INS to assume federal custody of the individual for the purposes of deportation or removal. *See* 8 U.S.C. § 1252c(a); *United States v. Vasquez–Alvarez,* 176 F.3d 1294, 1296 (10th Cir.1999). But the police officer who questioned Mena and searched her purse without her consent had no notion about her citizenship status confirmed by the INS, nor did he

immigration status, presumably based on nothing more than her name or ethnic appearance. Although the officers did not confront Mena in the context of a traffic stop, as the officers did in *Brignoni–Ponce*, the facts of this case sit within the ambit of the Supreme Court's decision in that case. The officers simply did not have the particularized reasonable suspicion the Fourth Amendment requires to justify (1) questioning Mena regarding her citizenship status or (2) searching her purse for immigration documentation without her consent. Therefore, just on these facts alone, we note that Mena alleges a Fourth Amendment violation. In light of the circumstances surrounding her detention generally, the officers' questions and the search of her purse certainly constituted an "undue invasion of privacy." *See Franklin,* 31 F.3d at 876.

Evaluating the facts most favorable to Mena "in their totality," [16] we conclude that the manner in which she was seized and detained was objectively unreasonable. Thus, Mena's allegations point to a violation of her rights under the Fourth Amendment. Because Mena successfully alleges the violation of a constitutional right, we now proceed to the next step in the qualified immunity inquiry.

**B. Whether Mena's Right to be Free From the Type of Seizure She Alleges Was Clearly Established**[17]

 The Supreme Court in *Saucier* directed that if a constitutional violation could be proved by accepting the facts stated by the party asserting the injury, "the next, sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Therefore, we must determine whether the right to be free from the type of seizure and detention Mena alleges was clearly established. In doing so, a court must look to "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

For the reasons stated above, we hold that the right to be free from the type of search Mena alleges was clearly established at the time of the search. The analysis used to determine whether a plaintiff alleges a violation of a constitutional right is instructive in determining whether that right was clearly established.[18] We again emphasize that "to find that the law was clearly established ... we need not find a prior case with identical, or even 'materially similar,' facts. Our task is to determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d 1130, 1136–37 (9th Cir.2003) (quoting *Hope,* 536 U.S. at 741, 122 S.Ct. 2508) (citations omitted). Both *Graham* and *Franklin* had been decided by February 3, 1998, so the officers were on notice of their holdings. Although we had not yet decided *Montero–Camargo, Brignoni–*

---

have any knowledge whether Mena had previously been convicted of a felony and deported. In fact, Mena had no criminal record, nor had she been deported. Accordingly, the police officer could not have asserted the limited authority under § 1252c(a).

**16.** *Franklin,* 31 F.3d at 876.

**17.** Whether federal rights asserted by a plaintiff were clearly established at the time of the alleged violation is a question of law reviewed

de novo. *See Mabe v. San Bernardino County, Dep't of Soc. Servs.,* 237 F.3d 1101, 1107 (9th Cir.2001).

**18.** *See Saucier,* 533 U.S. at 201–02, 121 S.Ct. 2151 ("In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles[that] will become the basis for a holding that a right is clearly established."); *accord Robinson,* 278 F.3d at 1012–13 (quoting same from *Saucier* ).

*Ponce's* requirement of particularized reasonable suspicion for purposes of inquiry into citizenship status had long been the law. The law with respect to unreasonable seizures and detentions was thus sufficiently developed that any reasonable officer in 1998 would have known that the conduct Mena suffered was unlawful.

## II. Judicial Interference

### A. The Officer s' Jury Instruction Argument

The officers argue that they are entitled to a new trial on the claim of unlawful detention because the district court abused its discretion by rejecting the officers' proposed jury instruction on that claim. The officers contend that the instructions the district court formulated failed to recite the relevant law and were prejudicial to the officers. In particular, the officers contend that the instructions were flawed in the following ways: (1) the instructions did not establish that the law allows police limited authority to detain occupants of the premises while the police conduct a proper search; (2) the instructions did not indicate that officers may legally take certain actions to minimize the risk of harm associated with a lawful search; (3) the instructions did not emphasize that detention of residents during a lawful search should generally be considered reasonable under the Fourth Amendment, and that only in "special circumstances" should detention be considered unreasonable; (4) the instructions unfairly emphasized factors in the reasonableness analysis that favored the plaintiff-appellee; and (5) the district court improperly put a "time limit" on how long an officer may lawfully detain an occupant of the premises being searched.

■■■ A court must formulate jury instructions so that they fairly and sufficiently address the issues a case presents, accurately state the law, and are not misleading. *Duran v. City of Maywood,* 221 F.3d 1127, 1130 (9th Cir.2000). When a party alleges error in the formulation of the instructions, we consider the instructions as a whole and apply an abuse-of-discretion standard to determine whether they are misleading or inadequate. *Guebara v. Allstate Ins. Co.,* 237 F.3d 987, 992 (9th Cir.2001). Moreover, an error in instructing the jury in a civil case does not require reversal if it is harmless. *See Swinton v. Potomac Corp.,* 270 F.3d 794, 805 (9th Cir.2001), *cert. denied,* 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002).

■■■ Without even considering the deferential standard we apply to a district court's formulation of jury instructions, we conclude that the appellants' arguments plainly lack merit. With respect to unlawful detention, the district court instructed as follows:

> Generally, a police officer carrying out a search authorized by a warrant may detain occupants of the residence during the search, so long as the detention is reasonable. In determining the reasonableness of a detention conducted in connection with a search, you may look to all the circumstances, including the severity of the suspected crime, whether the person being detained is the subject of the investigation, whether such person poses an immediate threat to the security of the police or others or to the ability of the police to conduct the search, and whether such person is actively resisting arrest or attempting to flee. A detention may be unreasonable if it [is] unnecessarily painful, degrading, prolonged or if it involves an undue invasion of privacy. A police officer is required to release an individual detained in [connection] with a lawful search as soon as the officers' right to conduct the

search ends or the search itself is concluded, whichever is sooner.

The very first sentence of the relevant instructions negates the appellants' first contention; the instructions plainly *do* inform the jury that "a police officer carrying out a search authorized by a warrant may detain occupants of the residence during the search, so long as the detention is reasonable." The second purported flaw the appellants cite is the failure to instruct the jury that police officers may take actions to minimize the risk of harm during a lawful search. However, the district court in instructing the jury clearly pointed out that the reasonableness of a detention is directly related to the threat that the suspect poses to "the security of the police ... or to the ability of the police to conduct the search." The third purported flaw appellants proffer is that the district court's instructions did not indicate "that detentions of residents during the execution of a valid search warrant should generally be considered reasonable under the Fourth Amendment." The first sentence of the relevant instructions correctly characterizes the law: "Generally, a police officer carrying out a search authorized by a warrant may detain occupants of the residence during the search, so long as the detention is reasonable." Moreover, the district court did not unfairly emphasize factors in the reasonableness analysis that favored the plaintiff-appellee—the officers' fifth argument. The district court correctly invoked factors in the reasonableness analysis as articulated in *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, and *Franklin*, 31 F.3d at 876. As the district court properly stated, those factors include:

the severity of the suspected crime, whether the person being detained is the subject of the investigation, whether such person poses an immediate threat to the security of the police or others ... and whether such person is actively resisting arrest.... A detention may be unreasonable if it is unnecessarily painful, degrading, prolonged, or if it involves an undue invasion of privacy.

The officers contend, finally, that the district court improperly placed a "time limit" on how long an officer may lawfully detain an occupant of the premises being searched. But the district court correctly noted that a search carries with it only the "*limited* authority to detain occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (emphasis added). As the district court noted in its order denying reconsideration, "[t]he instruction merely makes clear that that authority does not persist once the search ends or becomes improper." Thus, we reject the officers' final argument regarding the district court's jury instructions on the claim of unlawful detention.

The district court's instructions fairly and adequately addressed the pertinent issues this case presented and they were not misleading. Because the district court did not abuse its discretion in formulating these jury instructions, we reject the officers' argument and affirm the district court's judgment with respect to its jury instructions on unlawful detention.

## B. Voir dire and Cross-examination

■ The officers further contend that the district court abused its discretion in conducting the voir dire and cross-examining defense witnesses. This contention is unfounded. The district court has broad discretion over how it conducts voir dire and how it supervises trials. *Paine v. City of Lompoc,* 160 F.3d 562, 564–65 (9th Cir. 1998). We review both the manner in which a district court conducts voir dire and supervises a trial for an abuse of discretion. *See Price v. Kramer,* 200 F.3d 1237 (9th Cir.2000).

■ The officers argue that the district court conducted voir dire in a way that appeared partial to the plaintiff-appellees, although they do not substantiate this claim. With no supporting evidence in the record, the officers contend that the court's questions were fraught with bias. We disagree. At voir dire, the district court has an obligation to "test the jury for bias or partiality." *Monroe*, 248 F.3d at 856 (9th Cir.2001). In this case, the district court did nothing more than ask questions of potential jurors concerning their ability to render a fair judgment. In fact, the court appeared particularly concerned with assembling a jury with no beliefs favoring or prejudicial to law enforcement officers:

> "Do any of you have any feelings about law enforcement officers that would influence you either in favor of them or against them? ... Would any of you have any difficulty after you listen to the evidence, all of the evidence that both sides introduce, in trying to figure out what you would think is reasonable conduct if [the judge] gave you some general instructions about how to define the term reasonable[?]"

Thus, we reject the claim that the district court abused its discretion at voir dire as baseless.

■ The officers also argue that the district court's cross-examination of defense witnesses appeared partial and influenced the jury. It is entirely proper for judges "to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." *Price*, 200 F.3d at 1253 (quoting *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir.1986)). We have held that:

> [a] trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when 'the record discloses actual bias ... or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.'

*United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir.2001) (quoting *Mostella*, 802 F.2d at 361). The officers cite no specific example of conduct by which the district court may have abused its discretion. Indeed, upon a review of the trial record, the district court's participation in the examination of witnesses was at all times appropriate, and frequently resulted in clarifying the evidence for both parties. By way of example, the district court asked:

> [U]nder what circumstances, if any, would you ever conclude it was reasonable to remove the handcuffs?

> Is it your practice, when you're conducting investigations about reputed gang members, to question people only if you know something about them or know the person to be questioned?

> And if [the police officers'] conduct in the field reflects judgment that is poor, it's your responsibility to discipline them, correct?

Moreover, the district court instructed the jury not to interpret the court's actions throughout the trial as indicating the court's opinion in the matter, and stressed that the verdict was solely for the jury to consider. *See Parker*, 241 F.3d at 1119 (finding no error when nothing in the record indicated actual bias and the court instructed the jury not to infer anything based on development of facts by the judge). Because it was well within the district court's discretion to examine witnesses to clarify the evidence at trial, we deny appellants' request for a new trial based on improper judicial interference.

## III. Punitive Damages

 The appellants finally appeal the award of punitive damages to plaintiff-appellee, contending that the award should be vacated as unsupported by the evidence. While we review an award of punitive damages for an abuse of discretion, we review a challenge to the sufficiency of evidence to support the award for substantial evidence. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906–07 (9th Cir. 2002). A challenge to a jury award of punitive damages must be rejected if there is substantial evidence to support the award. *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir.1999) (en banc). Substantial evidence is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Combs*, 285 F.3d at 907 (quotations and citations omitted).

 A jury may assess punitive damages in an action under 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). There is evidence in the record indicating that the officers had disdain for the house and its residents. Additionally, record evidence suggests that the officers recklessly disregarded Mena's constitutional rights under the Fourth Amendment. Therefore, because substantial evidence exists to support the jury award of punitive damages in this case, we reject the officers' argument regarding the punitive damages award.[19]

## Conclusion

The officers are not entitled to qualified immunity; the district court did not abuse its discretion with respect to its jury instructions, voir dire, and its cross-examination of witnesses; and substantial evidence in the record supports the award of punitive damages. Therefore, we AFFIRM the judgment of the district court.

AFFIRMED.

---

19. The officers' assertion that there was no evidence presented at trial that either officer had any direct contact with Mena, even if proved, does not insulate them from liability. Supervisory liability may be found in civil rights actions even if the supervisors in question are not directly involved in the acts leading to the constitutional deprivation. *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir.1991) (en banc). Because there is no dispute that the officers were directly responsible for supervising the search, a jury could properly hold them liable.