**Odonna CROSBY, Plaintiff,**

v.

**Sgt. HARE, et al., Defendants.**

**No. 93–CV–6454L.**

United States District Court,
W.D. New York.

July 19, 1996.

Matthew J. Fusco, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, for Odonna Crosby.

Michele Digaetano, Rochester, NY, for Maxine Hare, Thomas Meehan, Martinez, Mace, Carney.

Charles D. Steinman, Office of New York State Attorney General, Rochester, NY, for Allen.

Anne VanGraafeiland, Asst. U.S. Atty., United States Attorney, Rochester, NY, for Janet Reno, Drug Enforcement, The Immigration and Naturalization Service of the Department of Justice of the United States Government, Robert Nearing, Stachowski, Lobaugh, Lloyd M. Bentsen, The Bureau of Alcohol, Tobacco and Firearms of the Department of the Treasury of the United States Government, U.S. Customs, Jamcas, Dauman.

### DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Odonna Crosby, commenced this action under 42 U.S.C. § 1983 against various law enforcement officers and agencies. By stipulation of the parties, plaintiff has dismissed her claims against all the defendants except Henry Joncas, Jeanne Daumen, Richard Hare, Thomas Meehan, Petra Martinez, David Mace, and Patrick Carney. Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### FACTUAL BACKGROUND

Plaintiff's factual allegations, the truth of which must be assumed for purposes of these motions, are as follows. On the morning of April 13, 1992, a group of law enforcement officers arrived at plaintiff's residence at 650 Jay Street in the City of Rochester to execute a search warrant that had been signed earlier that day by then-United States Magistrate Kenneth R. Fisher. The warrant au-

thorized the police to search several sites, including 650 Jay Street, for items described in an affidavit submitted by John F. Ferster, a Special Agent of the Drug Enforcement Administration. The affidavit stated that Ferster had probable cause to believe that certain persons, including plaintiff and one Errol Taylor, were engaged in drug trafficking. Ferster stated that the items to be seized were firearms, illegal drugs, and other items related to drug trafficking.

All the defendants were members of the search team. Daumen is a Special Agent of the United States Customs Service. Joncas is a Special Agent of the Bureau of Alcohol, Tobacco and Firearms. The other defendants were Rochester Police Officers.

Plaintiff alleges that she was taking a shower in an upstairs bathroom when the officers entered. She does not allege that the entry itself was unlawful. Errol Taylor, who was then plaintiff's boyfriend, was in her bedroom. He did not reside at 650 Jay Street, but was visiting plaintiff.

Plaintiff claims that when she heard the officers entering the house, she opened the bathroom door to see what was going on. Because she had been taking a shower, she was not wearing any clothes. Defendant Hare, a male, entered the bathroom and ordered plaintiff at gunpoint to get down on the floor, which she did. Hare yelled to the other officers, "We need a female officer," and Daumen, who is female, came and continued to hold plaintiff in custody in the bathroom. Daumen also had her gun drawn. When Daumen entered the bathroom, the male officer who had first entered withdrew into the hallway.

Plaintiff alleges that she asked if she could get dressed and that Daumen would not let her. Plaintiff was forced to remain naked and because the door was partly open, male officers in the hallway were able to see her when they walked by while conducting their search. Daumen also allegedly would not allow plaintiff to cross her arms or legs. For much of the time that Daumen was in the bathroom with plaintiff, however, Daumen was standing in the doorway. *Id.* at 43.

After plaintiff asked Daumen more than once what was going on, Daumen told her that the police were looking for "records and documents." Crosby Deposition at 40. Plaintiff asked to see the search warrant, and the warrant was brought and shown to her.

Plaintiff again asked if she could get dressed and Daumen gave her some clothes from a hamper in the bathroom. The clothes belonged to plaintiff's brother, who also lived in the house, and were too big on plaintiff, so she asked if she could go into her bedroom and put on some of her own clothes.

In the meantime, Taylor had been taken into custody. In response to plaintiff's request to change her clothes, Daumen said, "Let me take Errol downstairs, and I will take you in the room to get some clothes." *Id.* at 49. After Taylor was taken downstairs, Daumen did escort plaintiff into plaintiff's bedroom. Plaintiff estimated that at that point, about fifteen to twenty minutes had elapsed since the officers first entered the house. *Id.* at 50.

Once plaintiff had dressed, Daumen handcuffed her, stating as she did so that it was for safety reasons. *Id.* at 53. She then took plaintiff downstairs into the living room. Taylor was there in handcuffs, along with a number of police officers. The police continued to search the house, remaining there for about another ninety minutes. *Id.* at 167. It does not appear that any contraband was found. Before they left, the officers removed plaintiff's handcuffs, and she was released. She was never formally arrested or charged with any crime in connection with these events.

Taylor was taken from the house in custody. He was subsequently charged with a number of offenses and eventually pleaded guilty to engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. On December 27, 1993, United States District Judge Michael A. Telesca sentenced Taylor to a term of imprisonment of 168 months.

■ Based on these allegations, plaintiff contends that her civil rights were violated in two ways. First, she alleges that defendants held her in custody without probable cause to

believe that she had committed a crime. This claim, then, is essentially a false arrest or imprisonment[1] claim under the Fourth Amendment. Second, she alleges that defendants violated her constitutional right to privacy by forcing her to expose her unclothed body to the police officers.

## DISCUSSION

### I. Fourth Amendment Claim

Based upon the undisputed facts in the record, and, where the facts are in dispute, upon plaintiff's allegations, I find that plaintiff has not demonstrated the existence of any genuine issue of material fact regarding her Fourth Amendment claim, and that defendants are entitled to judgment on this claim as a matter of law.

■ The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures of their persons and property. The tort of false arrest under New York law is "substantially the same as [a] section 1983 action" alleging a Fourth Amendment violation based on an allegedly unlawful arrest. *Raysor v. Port Authority of New York and New Jersey*, 768 F.2d 34, 39–40 (2d Cir.1985). The defendant in a § 1983 has the burden of proving that his actions were reasonable, which is essentially the same as the defendant's burden of proving that the arrest was authorized as a defense to a tort action. *Id.* at 40. "Since there is no question that the arresting officer[ ] acted under color of state law, if [he] made a false arrest then [he] also violated section 1983." *Id.*

In the case at bar, the police did not have a warrant to arrest Crosby, but only to search her residence. Thus, whatever authority they had to detain her arose from the fact that they were conducting the search.

■ As stated, plaintiff claims that her detention was unlawful because the police lacked probable cause to believe that she had committed a crime. Even if true, however, that contention is beside the point. A "war-

rant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). Therefore, "absent special circumstances, the police ... have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion." *Rivera v. United States*, 928 F.2d 592, 606 (2d Cir.1991) (citing *Summers*, 452 U.S. 692, 101 S.Ct. 2587).

■ There is no claim or evidence in this case that there was anything unlawful about the search itself, which was performed pursuant to a validly-issued warrant. It is only plaintiff's detention that she claims was unreasonable. Under *Summers*, however, I find as a matter of law that defendants did not exceed their authority in detaining plaintiff in the manner in which they did. Plaintiff has simply failed to allege any "special circumstances" that made her detention unlawful. For their own safety, it was more than reasonable for the police to detain Crosby, first at gunpoint while the officers conducted an initial security sweep of the house, and then for a further period of time in handcuffs. *See United States v. Fountain*, 2 F.3d 656, 666 (6th Cir.) (agents' handcuffing of defendant during execution of warrant to search residence in which he was present did not turn encounter into arrest requiring probable cause), *cert. denied*, 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993); and *Howard v. Schoberle*, 907 F.Supp. 671, 677 (S.D.N.Y.1995) (decision to handcuff occupants of apartment when police entered apartment to execute search warrant "was undeniably lawful"). Once the search was over, Crosby was promptly released from custody. These facts simply do not demonstrate any constitutional violation.

■ Furthermore, even if plaintiff's detention did violate her rights in some manner, the individual officers would be entitled to qualified immunity from liability from their actions. Considering their authority, as set

---

**1.** Under New York law, "the tort of false arrest is synonymous with that of false imprisonment." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir.1991)

(citing *Jacques v. Sears, Roebuck & Co.*, 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (1972)).

forth *Summers* and its progeny, to detain occupants of a house during the execution of a search warrant, it was clearly objectively reasonable for the officers in this case to believe that "a reasonably prudent police officer would have acted" as the officers did here. *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir.1994), *cert. denied,* ——— U.S. ———, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995). *See Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir.) (when facts are undisputed, "the court [should] decide the issue of qualified immunity as a matter of law …"), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

## II. Privacy Claim

■ The courts have recognized that the constitutional right to privacy also includes a right to bodily privacy. *See, e.g., Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir.1995); *Fortner v. Thomas,* 983 F.2d 1024, 1030 (11th Cir.1993); *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992). Depending on the factual circumstances, forcing a person to expose her body to other people, especially those of the opposite sex, may violate that right. *See, e.g., Lee v. Downs,* 641 F.2d 1117, 1119 (4th Cir.1981).

Plaintiff contends that defendants violated her right to bodily privacy by failing to allow her to get dressed sooner. In support of her claim, plaintiff relies upon *Franklin v. Foxworth,* 31 F.3d 873 (9th Cir.1994), in which the Ninth Circuit reversed a decision after a bench trial in favor of the defendant police officers on the plaintiff's Fourth Amendment claim.[2] The facts of that case, however, are clearly distinguishable from those in the case at bar. In *Franklin,* the police, while executing a search warrant of a home, found the plaintiff lying in his bed. The plaintiff, who was described by one of the officers as "an elderly gentleman," was suffering from advanced multiple sclerosis that rendered him unable to walk, or to sit up without assistance. Because his illness also made him unable to control his bowels, he wore only a T-shirt in bed. The police were told by

another resident of the house that the plaintiff was ill and should not be moved, and the officers themselves recognized that he was disabled. They handcuffed him and carried him to the living room, making no effort to clothe him or cover his genitals, and placed him on the couch. At some point he complained of being cold, and the police gave him a blanket. He was not allowed to return to his bed until the search of the entire house had been completed, which took over two hours, even though the officers had finished their unproductive search of his bedroom about an hour earlier.

Reversing the district court's decision, the Court of Appeals stated that "while detentions of occupants during the period of a search will under most circumstances prove to have been reasonable, a detention may be unreasonable in a particular instance either because the detention itself is improper or because it is carried out in an unreasonable manner." *Id.* at 876. The court further stated that "[a] detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy." *Id.* The court held that *Franklin* was an example of an "unusual case" in which the detention of the plaintiff was unreasonably given the facts that the plaintiff was "gravely ill and semi-naked," that the police provided him with no clothing, and that they forced him to remain sitting handcuffed in his living room for two hours rather than returning him to his bedroom within a reasonable time after the search of his room was completed. Furthermore, the court noted, the police had no reason to believe that the plaintiff had committed any crime, and it was obvious to them that he presented no risk of flight or danger to them. *Id.* at 876–77.

Both the condition of the plaintiff and the manner of the detention are significantly different in the case at bar. The plaintiff in *Franklin* was an elderly, sick man whom the

---

2. The plaintiff in *Franklin* based his claim solely on the Fourth Amendment, not on a right to privacy. To the extent that plaintiff in the instant case relies on *Franklin* in support of her Fourth Amendment claim, however, my analysis remains the same. For the same reasons that I find plaintiff's privacy claim to be flawed, I also find that defendants' conduct was reasonable vis-a-vis her Fourth Amendment claim.

police carried from his bed and forced to sit on a couch much longer than necessary. Given his condition, it was questionable whether he should have been moved from his bed at all, much less not returned to it after his room had been searched. In the case at bar, however, the police simply prevented plaintiff, a young, apparently healthy woman, from moving for fifteen or twenty minutes. Once they had completed their initial search and taken Taylor downstairs, plaintiff was allowed to dress and was also taken downstairs.

■ Although in *Franklin* the fact that the police did not initially clothe or cover the plaintiff was one of the factors relied upon by the court, that was only one of a number of circumstances which, taken in combination, led the court to conclude that the officers' actions were unreasonable. Furthermore, in the instant case plaintiff was simply made to remain where she was, in a room with a female officer who was standing in the doorway. As the other officers were conducting the search, they would "glance" in the bathroom. Crosby Deposition at 42. In contrast, the plaintiff in *Franklin* was picked up and carried semi-naked in full view of everyone present, including the other occupants of the house and twenty-three officers.

In addition, the police in *Franklin* had no reason to suspect the plaintiff of any illegal activity, and in fact they had not even known prior to entering the house that he resided there. In the case at bar, however, the police knew that Crosby was connected with Taylor, who was one of the main targets of the investigation that led to the search, and she was specifically named in the warrant application as one of the persons suspected of drug trafficking.

The Second Circuit's decision in *Rivera* is also distinguishable from this case. In *Rivera*, the court held that questions of fact existed concerning the reasonableness of the defendant police officers' conduct where the plaintiff alleged that three female officers conducted a strip search of her in front of a window that was covered by a nearly transparent curtain. She also alleged that when the officers entered her room, she was made to lie face down on the floor, and that when

she asked why they had broken into her home, one of the officers forced her head to the floor with his foot, aimed his shotgun at her head, and told her to be quiet. *Id.* at 599.

As the Second Circuit noted in *Rivera*, however, the mere possession of a search warrant "will not normally authorize strip searches of the occupants of the premises." 928 F.2d at 606. In the case at bar, however, plaintiff was not made to strip; she was found nude and was simply made to remain where she was until Taylor had been removed and a quick search of the house had been performed. There is also no evidence that she was handled roughly or subjected to physical force beyond that necessary to handcuff her.

Several other circumstances surrounding defendants' actions in this case should also be noted. First, it is not disputed that when the officers first entered the house, they performed a security sweep or cursory search for safety purposes. *See* Deposition of Christopher G. Allen, Anne VanGraafeiland Affidavit Ex. 3, at 14. That search included plaintiff's bedroom. Given that the officers did not know, at least until they had completed the security sweep, whether weapons might be present in the bedrooms, it was not unreasonable for them to detain plaintiff in the bathroom until after the security sweep was completed. Once that was done, plaintiff was allowed to go into her bedroom and get dressed.

Second, there is no evidence that any clothes were readily apparent at hand in the bathroom, or that plaintiff asked Daumen to get some clothes out of the clothes hamper and that Daumen refused. That it did not immediately occur to Daumen to look for any clothes for plaintiff does not make her actions unreasonable.

Based on the facts before me, then, I conclude that defendants did not violate plaintiff's Fourth Amendment rights. Even if they did, however, I also find that they are entitled to qualified immunity.

■ The doctrine of qualified immunity protects law enforcement officers from civil liability "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). On a motion for summary judgment, the qualified immunity issue should be resolved in an officer's favor where

> no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir. 1995) (citations and internal quotations omitted). In this context, "objectively unreasonable" means that "no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* at 420–21. Under this standard, then, a police officer can be immune "when he reasonably believes that a reasonably prudent police officer would have acted even though a reasonably prudent police officer would not have acted." *Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 722, 130 L.Ed.2d 627 (1995); *see also Lennon,* 66 F.3d at 421.

 When the facts are undisputed, "the court [should] decide the issue of qualified immunity as a matter of law, preferably on a pretrial motion for summary judgment ..." *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.) (citation omitted), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990); *see also Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991); *Oliveira,* 23 F.3d at 649. As stated, the facts here are mostly undisputed, and any disputes that do exist I have resolved in plaintiff's favor. Based on those facts, it is clear that defendants could reasonably have believed that their actions did not violate plaintiff's constitutional rights.

Assuming that it was clearly established at the time of the search that an occupant of a house being searched pursuant to a warrant had a right not to be subjected to unnecessarily degrading or embarrassing treatment, the officers here could reasonably have believed that their treatment of plaintiff was not of that nature. Hare, who first encountered plaintiff, quickly called for a female officer, and withdrew once Daumen entered the bathroom. Although plaintiff alleges that Hare and the other male officers could see her from the hallway, his actions nevertheless showed some sensitivity to plaintiff's situation.

Furthermore, given the circumstances previously described concerning the protective search, it was reasonable for the officers temporarily to keep plaintiff where she was. Since "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence," *Summers,* 452 U.S. at 702, 101 S.Ct. at 2594, it is hardly surprising that finding something for plaintiff to wear was not the uppermost concern in the officers' minds during the early stages of the search. It was also prudent of them to keep the bathroom door open for the sake of Daumen's safety so that they could assist her if Crosby created any trouble.

I conclude, therefore, that defendants are entitled to qualified immunity as a matter of law. For that reason, and because I find that plaintiff's rights were not violated in the first place, plaintiff's claims alleging that defendants violated her right to privacy are also dismissed.[3]

### CONCLUSION

Defendants' motions for summary judgment (Items 33 and 37) are granted, and the complaint is dismissed.

IT IS SO ORDERED.

---

**3.** My conclusion that plaintiff's claims are meritless makes it unnecessary for me to consider Daumen's argument that the claims against her should be dismissed because of improper service. I also note, however, that plaintiff has not rebutted Joncas's assertion that the claims against him should be dismissed for failure to show his personal involvement in the alleged violations. I agree with Joncas on that issue and would therefore dismiss the claims against him for that reason as well. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (personal involvement of defendant is prerequisite to liability under § 1983).