**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOANN DAVIS, an individual; PAUL CILLEY, an individual, *Plaintiffs-Appellees*, v. UNITED STATES OF AMERICA; NORMAN CONLEY, *Defendants-Appellants.* | No. 15-55671 D.C. No. 5:13-cv-00483-CBM-KK OPINION |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted February 8, 2017
Pasadena, California

Filed April 13, 2017

Before: Sidney R. Thomas, Chief Judge, and Andrew J.
Kleinfeld and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Chief Judge Thomas

## SUMMARY*

### Qualified Immunity/*Bivens*

The panel affirmed the district court's denial of federal agent Norman Conley's motion for summary judgment on the ground of qualified immunity for a *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 389 (1971), claim brought by Joann Davis against Conley, alleging wrongful detention under the Fourth Amendment.

Davis, who is an elderly woman, was detained by Conley in a public parking lot for two hours, while she stood in urine-soaked pants, and Conley questioned her incident to a search, concerning Davis' possession of a paperweight containing a rice-grain-sized bit of lunar material.

The panel held that Davis raised genuine issues of material fact as to whether Conley's detention of Davis was unreasonably prolonged and degrading under *Frankline v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). The panel also held that the circumstances leading up to the sting operation further supported the conclusion that Conley's detention of Davis was unreasonable where: Conley knew that Davis wanted to sell the paperweight due to her financial hardship arising from her severely ill son's medical expenses; Conley knew that Davis believed the paperweights were legally gifted to her late husband for his service as a NASA engineer; Conley knew that Davis initiated contact with NASA for assistance in selling the paperweight legally; and Conley did

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not inform Davis that her possession of the paperweight was illegal or ask her to surrender it to NASA. The panel concluded that Conley was not entitled to qualified immunity as a matter of law.

## COUNSEL

John K. Rubiner (argued), Gerard Fox Law P.C., Los Angeles, California; Steven I. Wallach, Gerard Fox Law P.C., New York, New York; for Defendants-Appellants.

Peter B. Schlueter (argued), Schlueter Law Firm PC, Redlands, California, for Plaintiffs-Appellees.

## OPINION

THOMAS, Chief Judge:

In this appeal, we consider whether a federal agent is entitled to qualified immunity from suit for detaining an elderly woman in a public parking lot for two hours, while she stood in urine-soaked pants, to question her, incident to a search, about her possession of a paperweight containing a rice-grain-sized bit of lunar material. We conclude he is not, and we affirm the judgment of the district court.

I

Joann Davis, and her late husband Robert, worked together at North American Rockwell, which had a contract with the National Aeronautics and Space Administration ("NASA") in connection with the nation's space program.

By all accounts, Robert was a brilliant engineer, and he ultimately became a manager of North American Rockwell's Apollo project. While working on the space program, he received many items of memorabilia, including two lucite paperweights. One contained a rice-grain-sized fragment of lunar material, or "moon rock;" the other contained a small piece of the Apollo 11 heat shield. According to unverified family lore, the paperweights were given to Robert by Neil Armstrong in recognition of Robert's service to NASA.

When Robert died in 1986, Joann retained possession of the paperweights. She married her current husband, Paul Cilley, in 1991. Davis began experiencing financial hardship in 2011. Her son was severely ill, having had over 20 surgeries and requiring expensive medical care. In addition, she unexpectedly had to raise several grandchildren when their mother, Davis's youngest daughter, died.

Her son suggested that the paperweights might have value, so Davis began contemplating selling them to cover some of his medical costs. She contacted some public auction houses, without success, so she then contacted NASA via email for assistance in "find[ing] a buyer for 2 rare Apollo 11 space artifacts." She explained that "[b]oth of these items were given to [her late husband] by Neil Armstrong," and that "[he] was very instrumental in all of the space programs right up until his death in February of 1986."

Davis's email was forwarded to the NASA Office of Inspector General at the Kennedy Space Center in Florida, where Norman Conley was a special agent and criminal investigator. Conley's supervisor instructed him to investigate whether Davis indeed possessed a moon rock and to obtain a Registered Confidential Source to initiate

telephone contact with her. A few hours after Davis sent the email, Conley's source called her, posing as a broker named "Jeff" who previously worked on the "space-shuttle program," was well-known at NASA, learned of Davis's email to NASA, and would help her sell the paperweights.

Over the course of seven phone calls with "Jeff," all of which were recorded but the first, Davis expressed concern that the paperweights would be confiscated by NASA unless she could somehow prove they were actually a gift to her late husband; she told "Jeff" that she had spoken with her accountant regarding her tax liability for the sale because she could not "hide stuff" and was "not that kind of person"; and she explained that she wanted to "do[] things legally" because she is "just not an illegal person." "Jeff" responded, agreeing that "you and I are both legal people," but "the sale of a moon rock . . . can't be done publicly."

In a later call, Davis told "Jeff" that she heard of someone serving a prison sentence for selling lunar material, but she understood her situation to be different because her late husband received the paperweights as a gift. At no point did "Jeff" or Conley inform Davis that all lunar material is property of the U.S. government or that her possession of the paperweights was illegal. Davis also mentioned during these conversations that, because her former husband worked for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, she had several firearms in her home that she was trying to sell.

Based on these phone calls, Conley obtained a warrant to search Davis and seize the moon rock paperweight.[1]  In his affidavit supporting the warrant, Conley stated that he believed Davis was "in possession of contraband, evidence of the crime, fruits, and instrumentalities of the crime concerning a violation of [18 U.S.C. § 641]."[2]

To execute the warrant, "Jeff" made arrangements with Davis to meet around noon on May 19, 2011, at a Denny's Restaurant located in Lake Elsinore, California.  Davis believed the purpose of this meeting was to finalize the sale

---

[1] NASA was not interested in seizing the heat shield paperweight because it would be too difficult to verify its authenticity.

[2] 18 U.S.C. § 641 reads in part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted–
>
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

of the paperweights. In fact, it was a government sting operation to seize the moon rock paperweight.

Davis proceeded to meet with "Jeff" at the restaurant. She was accompanied by Cilley, who was approximately 70 years old. At the time of the incident, Davis was 74 and 4'11" tall. Three armed federal agents and three Riverside County Sheriff's personnel were present, but not visible.

Once Davis, Cilley, and "Jeff" were seated in a booth inside the restaurant and exchanged pleasantries, Davis placed the paperweights on the table. "Jeff" said he thought the heat shield was worth about $2,000. Shortly thereafter, Conley announced himself as a "special agent," and another officer's hand reached over Davis, grabbed her hand, and took the moon rock paperweight. Simultaneously, a different officer grabbed Cilley by the back of the neck and restrained him by holding his arm behind his back in a bent-over position. Then, an officer grabbed Davis by the arm, pulling her from the booth. At this time, Davis claims that she felt like she was beginning to lose control of her bladder. One of the officers took her purse. Both Cilley and Davis were compliant. Four officers escorted them to the restaurant parking lot for questioning after patting them down to ensure that neither was armed. At some point before the escort, Conley left the restaurant and went to the parking lot.

Davis claims that she told officers twice during the escort that she needed to use the restroom, but that they did not answer and continued walking her toward an SUV where Conley was waiting. Davis subsequently urinated in her clothing. Although their accounts differ in some respects, Conley and Davis agree that he knew she was wearing urine-soaked pants as he interrogated her in the restaurant parking

lot. Davis claims that she was not allowed an opportunity to clean herself or change her clothing, despite communicating to Conley several times that she was "very uncomfortable."[3]

An officer read the search warrant aloud, and Conley then read Davis her *Miranda* rights. Conley asked Davis to sit inside the SUV, but Davis declined. Conley then proceeded to question Davis for one-and-a-half to two hours, during which time Davis remained standing in the same place. Davis was never handcuffed that day. Nonetheless, while Conley questioned her, another officer wearing a flack jacket stood behind her and pushed her each time she shifted her weight or stepped backwards. During the questioning, Conley kept Davis's purse and car keys and told her repeatedly that "they still really want to take you in," and that she needed to give him more information before he could release her. She was kept from going to her car. At least ninety minutes had passed when Conley told Davis she was free to leave.

After the sting operation was complete and NASA lunar experts were able to confirm the moon rock's authenticity, Conley opened a full investigation. The investigation was closed when the U.S. Attorney in Orlando, Florida, formally declined to prosecute Davis. Davis's son died seven months after the incident.

---

[3] Conley claims that he offered Davis "a number of remedies" regarding her wet clothing, all of which she refused. However, that factual dispute is not before us on this interlocutory appeal, in which we can only consider legal issues and must construe the facts in the light most favorable to the plaintiff.

On August 7, 2013, Davis and Cilley filed their first amended complaint against the United States and the NASA officials involved in the incident. Davis and Cilley raised, *inter alia*, a *Bivens* claim against Conley for wrongful detention under the Fourth Amendment. *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 389 (1971) (establishing a private right of action for damages against federal officials who violate the constitutional rights of others). Conley sought summary judgment for the *Bivens* claim on the ground of qualified immunity. Concluding that genuine issues of material fact existed as to the lawfulness of Davis's detention, the district court denied Conley's summary judgment motion.[4] Conley timely appealed.

II

Because Conley raises only legal issues in this interlocutory appeal, we have jurisdiction under 28 U.S.C. § 1291. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014); *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). We review de novo a district court's grant or denial of summary judgment. *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 818 F.3d 901, 908 (9th Cir. 2016). When considering a grant of summary judgment, "[v]iewing the evidence in the light most favorable to the nonmoving party," we "must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). On summary judgment, the moving party bears the burden of establishing the basis for its motion and

---

[4] The district court granted summary judgment as to other issues and other defendants, but those issues are not before us on this interlocutory appeal.

identifying evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Although we must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, we are also limited to considering what facts the officer could have known at the time of the incident. *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015)). "[S]ummary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits." *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997).

A defendant is not entitled to qualified immunity if "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and that right was "'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (citations omitted). The Supreme Court recently reiterated that a "clearly established" constitutional right "should not be defined 'at a high level of generality.'" *Pauly*, 137 S. Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, it must be "'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

III

The Fourth Amendment proscribes "unreasonable" searches and seizures. U.S. Const. Amend. IV. A detention

can be unreasonable "either because the detention itself is improper or because it is carried out in an unreasonable manner." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). We must determine reasonableness "from the perspective of a reasonable officer on the scene." *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Davis argues that Conley violated the Fourth Amendment because his detention of her was unreasonably prolonged and degrading, particularly given that she is elderly, her clothing was urine-soaked, the detention took place in a public parking lot, and the moon rock paperweight had already been seized. Viewing the facts in the light most favorable to Davis, we agree.

Under the Fourth Amendment, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981). Nevertheless, "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case." *Id.* at 705 n.21; *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("[A] lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." (internal quotation marks omitted)). For instance, search-related detentions that are "unnecessarily painful [or] degrading" and "lengthy detentions[] of the elderly, or of children, or of individuals suffering from a serious illness or disability raise additional concerns." *Foxworth*, 31 F.3d at 876. Thus, a "seizure must be 'carefully tailored' to the law enforcement interests that . . . justify detention while a search warrant is being executed." *Meredith v. Erath*, 342 F.3d 1057, 1062 (9th Cir. 2003) (citing *Summers*, 452 U.S. at 699–705).

In *Foxworth*, police officers executed a search warrant at a residence where a suspected gang member engaging in drug activity might be present at the home of his mother and the plaintiff.  31 F.3d at 874.  The plaintiff suffered from advanced multiple sclerosis, rendering him bedridden, unable to feed himself or sit up without assistance, and unable to control his bowels.  As a result, he wore only a t-shirt in bed. *Id.*  After entering the plaintiff's bedroom with guns drawn and searching the room, officers cuffed his hands behind his back, carried him to the living room, and placed him on a couch with his genitals exposed.  *Id.* at 875.  After complaining that the handcuffs were causing him pain and that he was cold and tired from sitting upright, the officers recuffed his hands in front of his body and gave him a blanket.  *Id.*  The plaintiff was then forced to sit on the couch for over two hours until the search of the house was complete. *Id.*  We held that the detention was unreasonable.  *Id.* at 878.

Here, Conley does not dispute that he detained Davis in the parking lot for up to two hours.  At the time of the detention, Conley was aware of several facts that color the reasonableness of his actions.  First, Conley knew that Davis was a slight, elderly woman, who was then nearly seventy-five years old and less than five feet tall.  Second, he knew that Davis lost control of her bladder during the search and was wearing visibly wet pants.  Third, he knew that Davis and Cilley were unarmed and that the search warrant had been fully executed by the time Davis was escorted to the parking lot.  Fourth, Conley knew that Davis had not concealed possession of the paperweights, but rather had reached out to NASA for help in selling the paperweights. Finally, because all but the first of the phone calls between Davis and "Jeff" were recorded, Conley knew the exact content of most of those conversations, including that Davis

was experiencing financial distress as a result of having to raise grandchildren after her daughter died, her son was severely ill and required expensive medical care, and Davis needed a transplant. Those conversations also revealed Davis's desire to sell the paperweights in a legal manner and her belief that she possessed them legally because they were a gift to her late husband.

Because the moon rock paperweight had been seized and both Davis and Cilley had already been searched for other weapons and contraband, Conley had no law enforcement interest in detaining Davis for two hours while she stood wearing urine-soaked pants in a restaurant's parking lot during the lunch rush. This is precisely the type of "unusual case" involving "special circumstances" that leads us to conclude that a detention is unreasonable. *See Foxworth*, 31 F.3d at 876 (quoting *Summers*, 452 U.S. at 705 n.21). Conley's detention of Davis, an elderly woman, was unreasonably prolonged and unnecessarily degrading.

Conley argues that the circumstances surrounding the detention in *Foxworth* are far more egregious and therefore distinguishable from Davis's detention. Specifically, Conley argues that, unlike the plaintiff in *Foxworth*, Davis was suspected of illegal activity and named in the search warrant, she consented to answering questions during the detention, and she was not partially nude or disabled during the detention. However, *Foxworth* does not require that a detention be so egregious to be found unreasonable. Here, Conley knew significantly more about Davis and the threat she posed—or, more accurately, did not pose—than the officers knew about the plaintiff in *Foxworth*. Moreover, the search in *Foxworth* was incomplete, unlike the search here. And the fact that Davis consented to further questioning has

no bearing on the reasonableness of the detention.   *See Foxworth*, 31 F. 3d at 875.

Nonetheless, Conley argues that the circumstances surrounding Davis's detention are more closely analogous to cases where the searches were found to be reasonable, such as *Crosby v. Hare*, 932 F. Supp. 490 (W.D.N.Y. 1996), and *Hunter v. Namanny*, 219 F.3d 825 (8th Cir. 2000).  Not only are these decisions not binding, they are distinguishable. Both *Crosby* and *Hunter* involve an embarrassing detention that occurred inside the plaintiff's home while officers conducted a search for illegal drugs.  Therefore, in both cases, the officers possessed law enforcement interests in detaining the plaintiffs, namely to prevent the destruction of evidence and to maintain officer safety.  *See Crosby*, 932 F. Supp. at 495; *Hunter*, 219 F.3d at 831.  Here, conversely, the search was complete, Davis stood detained for up to two hours with urine-soaked pants in view of the public, and Conley had no such interest.

Conley also argues that, because Davis mentioned during the phone calls with "Jeff" that she had several, possibly illegal, firearms in her home, he acted reasonably.  But when Davis was detained, officers had already confirmed that neither she nor Cilley was armed.  Further, Conley arranged the sting operation to take place over the lunch hour at a family restaurant.  This fact undermines his contention that he possessed a legitimate concern that Davis and Cilley would come to the meeting armed.

The remaining circumstances leading up to the sting operation further support our conclusion that Conley's detention of Davis was unreasonable.   Based on the conversations between Davis and "Jeff," Conley knew that

Davis wanted to sell the paperweights because she was experiencing financial hardship, particularly in light of her adult son's medical condition.  He also knew that she believed the paperweights were gifts to her late husband—a belief bolstered by the fact that the artifacts were each encased in a lucite globe, a common gift for honoring a person's service or accomplishments—and that she was thus in legal possession of them.  Finally, he knew that she was elderly, that she intended to sell the paperweights legally, and that she initiated contact with NASA for assistance in doing so.  Despite all of this knowledge, Conley did not inform Davis that her possession of the paperweights was illegal or ask her to surrender them to NASA.  Instead, he organized a sting operation involving six armed officers to forcibly seize a lucite paperweight containing a moon rock the size of a rice grain from an elderly grandmother.

IV

Considering these facts in the light most favorable to Davis, as well as the facts Conley knew at the time of the detention, the district court correctly concluded that Davis has raised genuine issues of material fact as to whether Conley's detention of Davis was unreasonably prolonged and degrading under *Foxworth*, and that Conley was not entitled to qualified immunity as a matter of law.

**AFFIRMED.**